## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

ROSA E. ALGARÍN-SANTOS,

     Plaintiff,

     v.

COMMISSIONER OF SOCIAL
SECURITY,

     Defendant.

Civil No. 18-1823 (BJM)

## OPINION AND ORDER

Rosa E. Algarín-Santos ("Algarín") seeks review of the Commissioner's finding that she is not disabled and thus not entitled to disability benefits under the Social Security Act (the "Act"). 42 U.S.C. § 423. Algarín contends the Commissioner's decision should be reversed because the administrative law judge ("ALJ") erred in finding that her mental impairment did not meet the criteria of Listing 12.04, and that the ALJ's residual functional capacity ("RFC")[1] finding and step five non-disability determination were not supported by substantial evidence. Docket Nos. 1, 13. The Commissioner opposed. Docket No. 16. This case is before me on consent of the parties. Docket Nos. 18-20. After careful review of the administrative record and the briefs on file, and for the reasons set forth below, the Commissioner's decision is **VACATED** and **REMANDED**.

## STANDARD OF REVIEW

After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and her delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Secretary of Health & Human Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v.*

---

[1] An individual's residual functional capacity is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments.  20 C.F.R. § 404.1520(e) and 404.1545(a)(1).

*Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir. 1991). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Visiting Nurse Association Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 72 (1st Cir. 2006) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Secretary of Health & Human Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when she "is not only unable to do [her] previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

Generally, the Commissioner must employ a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote v. Secretary of Health & Human Services*, 690 F.2d 5, 6–7 (1st Cir. 1982). In step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, she is conclusively presumed to be disabled. If not, the ALJ assesses the claimant's RFC and determines at step four whether the impairments prevent the claimant from doing the work she has performed in the past. If the claimant is able to perform her previous work, she is not disabled. 20 C.F.R. § 404.1520(e). If she cannot perform this work, the fifth and final step asks whether the

claimant is able to perform other work available in the national economy in view of her RFC, as well as her age, education, and work experience.  If the claimant cannot, then she is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At steps one through four, the claimant has the burden of proving that she cannot return to her former employment because of the alleged disability.  *Santiago v. Secretary of Health & Human Services*, 944 F.2d 1, 5 (1st Cir. 1991).   Once a claimant has demonstrated a severe impairment that prohibits return to her previous employment, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy that the claimant can perform.  *Ortiz v. Secretary of Health & Human Services*, 890 F.2d 520, 524 (1st Cir. 1989). Additionally, to be eligible for disability benefits, the claimant must demonstrate that her disability existed prior to the expiration of his insured status, or her date last insured.  *Cruz Rivera v. Secretary of Health & Human Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

The following is a summary of the treatment record, consultative opinions, and self-reported symptoms and limitations as contained in the Social Security transcript.

Algarín was born on July 16, 1977, has a Master's Degree,[2] claims to not speak English,[3] and last worked as a services program coordinator and criminal justice professor. Social Security Transcript ("Tr.") 295, 669, 686, 689, 691-692. On June 24, 2013, Algarín applied for disability insurance benefits, claiming to have been disabled since January 14, 2013 (onset date) at age 35[4] due to depression, anxiety, altered nerves, gastroparesis, severe stomach pain, and endometriosis. Tr. 669, 686, 690. She last met the insured status requirements on March 31, 2018 (date last insured).[5] Tr 286, 686.

---

[2] The ALJ noted that Algarín has at least a high school education (Tr. 295). There is evidence in the record that she has more than four years of college or university.

[3] Algarín testified that she does not speak English. Tr. 240-241. At Tr. 689, the disability report states that Algarín does not speak or write in English and prefers Spanish, but Tr. 690 says that she does speak and understand English. The ALJ noted in the decision that Algarín is able to communicate in English. Tr. 295.

[4] Algarín was considered to be a younger individual (Tr. 295), and "[i]f you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work." 20 C.F.R. 404.1563(c).

[5] The disability report at Tr. 686 indicates that the date last insured is March 31, 2017.

Algarín-Santos v. Commissioner of Social Security, Civil No. 18-1823 (BJM)                    4

*Treating physicians*

*Physical conditions:*

 The record contains evidence starting in 2012 that Algarín visited hospital emergency rooms and had numerous exams performed for complaints of abdominal pain.

 Algarín had a hepatobiliary scan performed at Hospital Metropolitano Dr. Pila in August 2012, which revealed a normal gallbladder ejection of 37%. A gastroscopy performed in September 2012 showed normal results. A biopsy showed active chronic gastritis. Exh. 2F at Tr. 792-794.

**Damas Hospital Ponce**

 Algarín was hospitalized at Damas Hospital Ponce from October 30 to November 5, 2012 for pain on her right upper quadrant and epigastric area. Lab work indicated high levels of bilirubin. A gastric emptying study showed extremely delayed gastric emptying, consistent with gastroparesis (stomach cannot empty itself normally). A C.T. scan of the abdomen and pelvis also showed a large amount of undigested food particles within a moderately distended stomach. An abdominal ultrasound showed gallbladder sludge and gallbladder wall thickening, and a dilated common bile duct. An endovaginal ultrasound showed a myomatous uterus. She was diagnosed with sedimentation in her gallbladder and gastroparesis.

 In December 10, 2012, Algarín underwent a laparoscopic cholecystectomy (gallbladder removal) and discharged the next day. In the past medical history table, all other illnesses are check-marked as absent, including psychiatric illness, and Gilbert's Disease (inability to properly process bilirubin) was handwritten in. The discharge document indicates that Algarín recovered. Exh. 1F at Tr. 348, 353-382, 755-789.

 On January 10, 2013, Algarín was again treated for acute pain in her upper and lower abdomen. The pain was acute, intermittent, sharp, and pressing. She was diagnosed with acute gastritis, prescribed medications, and discharged. Exh. 1F at Tr. 349-351.

 Algarín went again to the emergency room at Damas Hospital on October 1, 2013 for vaginal bleeding and endometrial polyps. A fractional curettage was performed. The results of the examination are illegible to me. Exh. 1F at Tr. 352.

 Algarín also underwent a total hysterectomy and salpingectomy (removal of the uterus and fallopian tubes) due to vaginal bleeding on June 27, 2014. Exh. 20 F at Tr. 430-447, 874-891; Exh. 21F at Tr. 448-470, 892-914.

A radiograph of the cervical spine from May 2014 shows no abnormality. A lumbar spine x-ray from August 2014 shows normal alignment, and degenerative changes with anterior spondylosis. Exh. 26F at Tr. 936-937.

**Dr. Francis A. Zayas ("Dr. Zayas") and Dr. Ricardo Blondet ("Dr. Vissepo")**

Dr. Zayas, gastroenterologist, and Dr. Vissepo, internist, also treated Algarín for abdominal pain. Progress note from Dr. Zayas 2013 to 2015 are illegible. Exh. 15F at Tr. 408-410, 848-850; Exh. 28F at Tr. 496, 977; Exh. 29F at Tr. 497-500, 978-981. Progress notes from Dr. Vissepo from 2013 to 2015 are also illegible. Exh. 27F at 948-965; Exh. 28F at Tr. 484-485, 965-966. An upper gastrointestinal ("G.I.") series and bowel series from October 2013 showed rapid transit time and an otherwise unremarkable upper G.I. and bowel series. Exh. 15F at Tr. 851.

**Female Consultants of Puerto Rico (Dr. Yolanda E. González and Dr. Gladysmaría Figueroa)**

Gynecologists Dr. González and Dr. Figueroa began treating Algarín in 2013. Algarín had chronic pelvic pain and was diagnosed with endometriosis and gastroparesis. On November 8, 2013, a Nuva Ring was placed to control uterine bleeding. Exh. 9F at Tr. 816-825.  A bone mineral density study dated September 4, 2014 showed that Algarín had osteopenia (loss of bone mass). Ext. 22F at Tr. 915-920. Progress notes from September 3, 2015 show that Algarín had a hemorrhagic right ovarian cyst. Most notes are illegible. A report submitted to the DDP on February 20, 2014 offered no neurological or extremities limitations. Exh. 25F at Tr. 933-935; Exh. 30F at Tr. 501-502, 982-983.

In a report for the Disability Determination Program ("DDP"), Dr. Figueroa informed that Algarín had chronic endometriosis, with a guarded prognosis, and assessed that Algarín could not perform any physical activity. Exh. 30F Tr. 506-507.

**Dr. Luis Irizarry-Pabón ("Dr. Irizarry")**

The record contains illegible handwritten notes by Dr. Irizarry, internist, dated November 2015 to 2017. Diagnoses include gastroesophageal reflux disease ("GERD"), carpal tunnel syndrome ("CTS"), gastroparesis, fibromyalgia, and depression. Tr. 46-85, 113-130; Exh. 34F at Tr. 521-559, 1029-1033. This record contains numerous lab results, which as a lay person I cannot interpret. Within Exhibit 34F, there is a copy of a pelvic ultrasound performed in August 2015 that reveals that Algarín had a complex cyst in her right ovary, likely hemorrhagic, and a simple cyst in the left ovary. Tr. 1042. In February 2016, Dr. Irizarry referred Algarín to a rheumatologist. Tr. 10, 521. The record contains evidence of a visit with Dr. Roberto Álvarez, rheumatologist. Notes

are illegible. Tr. 10-11, 24-26, 86-87. There is also some evidence of treatment after the ALJ's decision date with gastroenterologist Dr. Rafael Cordero and gynecologist Dr. Carol Rivera in late 2016 and 2017. Algarín was being evaluated for Gilbert's Disease and a rheumatic condition. Tr. 89-97, 108. Multiple copies of notes and lab work are contained in Tr. 44-235, 251-274.

**Dr. Moraima Vélez ("Dr. Vélez")**

There is some evidence of physical therapy ordered by Dr. Vélez on February 9, 2016 to reduce pain, but the handwritten notes are illegible. Exh. 33F at Tr. 1026-1028.

*Mental conditions:*

**Dr. Manuel A. Brignoni ("Dr. Brignoni")**

Dr. Brignoni, psychiatrist, diagnosed Algarín with major depressive disorder, recurrent, moderate (diagnosis code 296.32). Her listed Axis III medical conditions here are endometriosis, constipation, and gastroparesis.

The record contains two progress notes, from August 19 and September 11, 2013. The legible handwritten portions of the progress notes indicate that Algarín was prescribed Ambien and Prozac, and lab work was ordered to test her blood, metabolism, and liver and thyroid functions. She was also referred to San Juan Capestrano Hospital for partial hospitalization. However, she didn't tolerate the prescribed medications, so she was referred for further treatment with a psychologist, and further evaluation and treatment of her gastroparesis condition.

Dr. Brignoni check-marked the following observations. Algarín was alert and cooperative. She was oriented in person, time, and place. Her thoughts were logical, coherent, and relevant. Her judgment was partial. Her affect was restricted on the first appointment, and adequate during the second visit. Her insight was adequate. Her mood was first sad, and anxious the second time. Her attention and concentration, appetite, and libido were diminished. Her sleep pattern was altered. Exh. 3F at Tr. 383-388, 796-801.

**Dr. Rosa Rivera-Rivera ("Dr. Rivera")**

Dr. Rivera, Algarín's treating clinical psychologist, submitted three psychological reports/questionnaires to the DDP, dated November 25, 2013 (Exh. 13F at Tr. 389-392, 829-832), October 3, 2014 (Exh. 23F at Tr. 471-472, 921, 922; Exh. 24F at Tr. 473-483, 923-932), and November 10, 2015 (Exh. 32F at Tr. 511-520, 1016-1025) with the following information.

Dr. Rivera first examined Algarín on October 5, 2013. Her main conditions were severe gastroparesis, endometriosis, bone deficiency, and major severe recurring depression due to her

medical conditions. It was difficult for Algarín to manage the physical, emotional, and social changes that resulted from her illnesses. Her physical health history led her to feel sad, hopeless, useless, anhedonic, pessimistic, irritable, and less tolerant. Her ability to manage stressful situations had lowered. She cried frequently and worried excessively. Algarín also suffered from insomnia which limited her alertness and attention span. Dr. Rivera noted that Algarín could not take medications for her mental conditions because her physical treatment for gastroparesis impeded a combined treatment. Dr. Rivera diagnosed major depression, recurrent, moderate, and considered that Algarín needed psychological treatment at least biweekly.

In the 2013 report, Dr. Rivera stated that Algarín was receptive and communicative, and her speech was appropriate. Her affect and mood were sad. She was oriented (in person, place, and time). Her memory (immediate, short term, recent, and remote) was preserved. Her attention was preserved and adequate. She had to write things down because she was forgetful. For her education and age, her concentration was "OK", and her intellectual functions were adequate. She had good judgment, managed impulses (anger), and responded adequately to situations. She had good insight, and was aware of her psychological suffering. She also appeared to have good intellectual competency. Algarín's daily activities included preparing her daughter for school, going to medical appointments, attending class, and trying to do chores, which could be difficult for her because she felt physical pain. Algarín "follows instructions, even though her concentration is diminished." "She possesses the ability to focus and perform simple tasks." "She is able to relate well to others." Algarín's ability to tolerate stress was low and the pressure of a day at work would be counterproductive for her condition. Her social interaction had diminished (she preferred to stay home, did not interact in large groups but interacted with her close relatives and class peers). Algarín needed assistance to perform chores and needed transportation because she avoided driving upon medical recommendation. She could manage benefits on her own. Dr. Rivera opined that it would be very difficult for Algarín to concentrate and persist at work-related tasks and complete a normal workday without interruptions. Tr. 389-392.

In 2014, Dr. Rivera reported observing that Algarín's level of functioning had diminished in a progressive manner. Her judgment was good and her level of introspection was adequate. She understood and was aware of her physical and emotional suffering but had difficulty in adequately managing her emotions. Algarín exhibited a sad mood, slow psychomotor behavior, loss of concentration, and crying episodes. She was also anhedonic, spent her time lying down, was not

able to do housework, and had little energy to complete hobbies. Algarín stopped going out because she needed to frequently rest during long distance travel. Algarín scored a 43 on the Beck Depression Inventory ("BDI"), suggesting severe depression. No suicidal or homicidal thoughts were present. As to Algarín's intellectual competency (ability to remember, read, write, and perform routine tasks on a sustained basis), "[s]he indicates that routine tasks are easier for her." On interview, Algarín's apparent intellectual functioning was intact and her memory was good, but exhibited some difficulty with her immediate memory. She was receptive and expressive, her speech was adequate and coherent, but she sometimes forgot words. She could not recite the months backwards, or subtract in series of threes and sevens. As to her social competency (ability to relate to other people, interests, and daily activities), Algarín reported and Dr. Rivera observed during therapy that Algarín's tolerance levels towards her situation and towards others had diminished, and her frustration had increased. She did not like interacting in large group, and her nuclear and social family reduced to her daughter and partner. Regarding her ability to sustain concentration and attention, relate appropriately to the interviewer, and perform tasks independently, Dr. Rivera observed that "[e]ven though she can maintain attention sometimes she exhibits difficulty concentrating and maintaining the flow of the conversation. Within her limits, she tries to be independent." She took care of her personal hygiene and handle her own funds. Dr. Rivera's prognosis was that with adequate psychological and medical treatment, Algarín could maintain stability. It was also Dr. Rivera's opinion that it would be difficult for Algarín to currently and in the long run complete a normal workday and persist at work-related tasks because she would have a lot of interruptions and be absent frequently. Tr. 474-482.

In 2015, Dr. Rivera reported that Algarín's symptoms had worsened from light to moderate at the beginning of treatment, to severe. Dr. Rivera observed that psychomotor behavior was slow and anxious. She was oriented and her insight as to her situation was adequate. Her impulsivity had increased but she maintained adequate levels of judgment. Her short term and recent memory were adequate and intact, but as to remote memory Algarín would at times show gaps when speaking of routine events that she usually did with her daughter. She would lose attention on occasion but succeeded in returning to the subject of the conversation. Algarín could still adequately carry out personal tasks. Dr. Rivera assessed that the prognosis was low due to worsening of the depressive symptoms with no short-term solutions, and that it would be highly

unlikely that Algarín could carry out a daily work routine without breaks and period of rest between tasks. Tr. 511-516.

Both in 2014 and in 2015, Dr. Rivera check-marked the following limitations for Algarín's mental RFC assessment. In understanding and memory, Algarín was moderately limited in her ability to understand and remember short and simple, or detailed instructions. In sustaining concentration and persistence, Algarín was moderately limited in her ability to carry out short and simple, or detailed instructions; to sustain an ordinary routine without special supervision; and to make simple work-related decisions. She was markedly limited in her ability to maintain attention and concentration for extended period, to work in proximity of others without being distracted by them, and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. As to social interaction, Algarín was moderately limited in her ability to interact with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers. Algarín was also markedly limited in her ability to adapt to changes in the work environment.  Tr. 480-481, 517-518.

Progress notes from 2013 and 2014 also shed light regarding Algarín's stressors. Algarín worried about paying her bills late, and about being unable to work due to her health conditions. She also worried about her daughter's future. These topics greatly raised her stress levels, and she was working on how to adequately manage her emotions. Exh. 14F at Tr. 393-407. Other notes are illegible. Exh. 34F at Tr. 1029-1067.

### *Procedural History*

Algarín applied for disability insurance benefits on June 24, 2013  (protective filing date), claiming that she stopped working on January 14, 2013 (onset date) because she suffered from depression, anxiety, altered nerves, gastroparesis, severe stomach pain, and endometriosis. Exh. 1D at Tr. 669; Exh. 1E at Tr. 686; Exh. 2E at Tr. 690-691.

She informed in a function report and in a disability report feeling a lot of pain in the abdominal and pelvic area due to her severe gastroparesis condition. The condition prevented her from eating solids. She could not eat but would vomit and was therefore weak, and had stomach inflammation. She would feel nauseous and dizzy, so she would spend the day lying down, Her mother helped her with her physical needs. She could not walk long distances, exercise, or carry or lift heavy objects. She could walk twenty to twenty-five minutes before needing a break of about

thirty minutes. Her physical conditions and pain depressed her and gave her a lot of anxiety and sleeplessness. She was anhedonic, and had no motivation to do chores, cook, or do hobbies. She only went out for medical appointments because she felt a lot of pain. Being around a lot of people exasperated her but she had no problem with authority figures. She could concentrate and pay attention for three to five minutes, could not follow written or oral instructions, and would not finish what she started. Her husband reminded her to take her medications. She was not able to handle changes in her routine and could not accept what was happening to her. She also claimed not being able to handle funds because she lost interest in taking care of her finances.. Exh. 4E at Tr. 318-326; Exh. 6E at Tr. 328-333.

On October 9, 2013, Dr. Gil A. Hermida-Pérez ("Dr. Hermida") performed a consultative internist evaluation. Algarín's chief complaint was abdominal pain, with a gastroparesis diagnosis. She could not tolerate medications. Dr. Hermida noted that Algarín's abdomen was depressible and tender to palpation, and that she exhibited pain upon removal of pressure (positive Blumberg's sign). The rest of the examination (head and neck, back, extremities and joints, neurological function, and gait) was normal. Dr. Hermida diagnosed Algarín with anxious depressive disorder, non-specific abdominal pain, gastroparesis, and endometriosis. Exh. 4F at Tr. 802-808. Dr. Hermida assessed that "[h]er main disability appears to be related to her emotional/mental condition that could preclude an adequate social interaction. There is no impairment for walking, standing, sitting, lifting, carrying, handling objects, speaking, and hearing." Exh. 4F at Tr. 804.

Dr. Luis A. Toro ("Dr. Toro") performed a consultative psychiatrist evaluation on October 11, 2013. Algarín informed that she could not work because she suffered from severe gastroparesis, endometriosis, and mental conditions. She received treatment by I.V. and hospitalization for her gastroparesis condition, and was unable to take medications for the mental conditions because of the gastroparesis. As to her daily activities, Algarín informed that she lived with her thirteen year-old daughter; got along well with her daughter, mother, and neighbors; and used to relate and get along well with her former co-workers and supervisor. Her mother did chores and cooked. Algarín watched television, played with her daughter and helped her with homework. Algarín took care of her own personal needs without supervision. Exh. 5F at Tr. 810.

Dr. Toro found that Algarín appeared to be well developed, well nourished, neat and clean. She was calm and cooperative during the interview, and had good contact with reality. Her speech was coherent, relevant, and spontaneous. She spoke in a normal tone of voice, and mainly

complained about her gastroparesis condition. She was oriented in person, place, and time, and had good memory (recent, immediate, and remote). Her attention and concentration were normal. Her judgment and reasoning were not impaired. Her affect was appropriate. She had good insight into her condition, and her mood showed her to be slightly depressed. She showed no physical or emotional distress, unusual behavior, or disorganized thought process. Dr. Toro diagnosed Algarín with a mood disorder secondary to the gastroparesis condition with depressive features. He placed her Global Assessment of Functioning ("GAF")[6] score between 60-70. In his opinion, Algarín was able to handle funds adequately and was capable of normal interpersonal relationships. Prognosis was guarded. Exh. 5F at Tr. 811.

At Exhibit 2A, non-examining medical consultants offered their assessments based on the medical records. On November 22, 2013, Dr. Brenda Concepción ("Dr. Concepción") assessed that Algarín's abdominal pain was secondary to gastroparesis and endometriosis, but that the medically determinable impairments were not severe. Tr. 572. On November 6, 2013, Dr. Hugo Román- Rivera ("Dr. Román") opined that the evidence supported a moderate medically determinable impairment, but did not meet the diagnostic criteria for Section 12.04 (Affective Disorders) ("A" criteria). As to "B" criteria, Dr. Román assessed that Algarín had moderate difficulties in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace, and no recurrent episodes of decompensation, each of extended duration. Her statements regarding symptoms were partially credible but not to the extent she alleged. Algarín could remember work-like procedures and simple instructions but  was moderately limited in remembering, understanding, and carrying out detailed instructions, and maintaining attention and concentration for extended periods. Dr. Román also opined that Algarín

---

[6] "GAF is a scale from 0 to 100 used by mental health clinicians and physicians to subjectively rate the social, occupational, and psychological functioning of adults.  A GAF score between 51 and 60 indicates 'moderate symptoms' or 'moderate difficulty in social occupational, or school functioning.'"  *Hernandez v. Comm'r of Soc. Sec.*, 989 F. Supp. 2d 202, 206 f.n. 1 (D.P.R. 2013)(*quoting* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. text rev. 2000) (DSM–IV–TR)).  "The GAF score range between 41 and 50 is described as '[s]erious symptoms … OR any serious impairment in a social, occupational, or school functioning …'" *Id*. at f.n. 2. "A GAF score of 61-70 indicates: 'Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.' DSM-IV at 34."*Lopez v. Colvin*, No. 15-cv-30200-KAR, 2017 U.S. Dist. LEXIS 49183, at f.n. 5 (D. Mass. Mar. 31, 2017).

was moderately limited in her ability to complete a normal workday and work-week without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. She was able to sustain pace and attention for two-hour intervals in simple tasks. She was moderately limited in her ability to interact appropriately with the general public, but not significantly limited in her ability to maintain socially appropriate behavior, interact with co-workers and supervisors, ask simple questions and request assistance, accept instruction, and respond appropriately to criticism from supervisors. She was moderately limited in her ability to respond appropriately to changes in the work setting. There was no evidence to establish the presence of "C" criteria. Tr. 573-576.

Algarín's claim was denied on November 22, 2013, with a finding that she could perform heavy/very heavy unskilled work. Tr. 303, 564, 577, 599.

Algarín requested reconsideration, alleging worsening of her conditions but offered no additional evidence. Tr. 581, 587, 603. She described in a function report dated March 5, 2014 that her gastroparesis and endometriosis caused severe abdominal and pelvic pain, persistent fatigue and dizziness, and constant vomiting. She could not eat, lacked adequate nutrition, lived off nutritional supplements, and injected herself with vitamins. Stress aggravated her stomach condition. Her major depression affected her ability to concentrate and sleep, and gave her a lot of stress, anxiety, and mood changes. She was forgetful and lacked interest in doing things she liked doing, like cooking, reading, walking, and being socially active. She didn't like leaving the house, and only shared time with her family and went to medical appointments.  She could not do house or yard work, could not lift heavy objects, or stand or sit for long periods of time, or walk long distances, or bend over like before. She could walk nine to ten minutes leisurely before needing to stop and rest for around the same amount of time. She could pay attention for ten to fifteen minutes, and follow written instructions. She could also follow oral instructions but sometimes needed them to be repeated to her several times. She has no problem with authority figures. She could handle money. Exh. 7E at Tr. 334-341, 724-731.

Algarín summarized her situation as follows: "I have problems going to the bathroom. The Gastroparesis, because it's a paralysis of the stomach, increases gastric emptying too much. Due to this condition my stomach can't contract normally and because of that it's not capable of expelling foods to the small intestine in the right form. Aggravating the situation with the adhesions of the endometriosis. Due to this condition I have vomiting, dizziness, nausea, weight loss, always

feeling full, abdominal pains and abdominal weight. To maintain my weight I take nutritional supplements and vitamin injections." Tr. 341.

The case was referred to Dr. Gladys M. Jiménez, who affirmed Dr. Román's findings, and to Dr. Cristina Ortiz, who affirmed Dr. Concepción's assessment. Exh. 4F at Tr. 588-589.

The claim was denied on reconsideration on May 21, 2014. Tr. 307, 579, 604.

At Algarín's request, a hearing before ALJ Luke Brennan was held on July 25, 2016. Algarín and a vocational expert ("VE") Alina Kurtanich testified. Tr. 236-250.

Counsel for Algarín summarized that her most disabling condition was gastroparesis, that Algarín could only eat liquid food supplements, and had to go to the bathroom a number of times during the day because her bowel movement was slow. She also suffered from severe gastritis, scoliosis, endometriosis, and severe depression and anxiety.  Tr. 239.

Algarín testified that on her onset date, she went to work but was taken to the hospital because of a severe gastritis condition. She was diagnosed with stomach paralysis, and it was so severe that she could not take medications, could not eat or drink, felt nauseous, vomited a lot, and felt a lot of pain. It also affected her intestines. She needed to take nutritional supplements because when she ingested food, her stomach could not digest it and it would rot there, causing her to vomit a lot. She took a medication to be able to have bowel movement, MiraLAX twice a day or Colyte (a gallon every three days), which would swell her stomach and cause her to go to the bathroom ten or more times between 9:00 a.m. and 5:00 p.m. She would feel strong pain and contractions and it did not help her go to the bathroom regularly but, without medications, she could not evacuate. She would sometimes get injected at the hospital with morphine to reduce the pain. She also had her uterus extracted because of excessive hemorrhages and endometriosis. She could not bear the pain of the endometriosis combined with the gastroparesis. She spent the day lying down in her room, only went out for medical appointments, and did not drive because she got dizzy. Tr. 242-246.

The VE testified that Algarín's former employment as a college or university faculty member, and as coordinator of services program, were skilled positions, light work, with a special vocational preparation ("SVP") number of eight. Her former job as a financial secretary was sedentary, skilled work with a SVP of six. Tr. 242. The ALJ asked the VE if a person with the same age, education, and vocational background as Algarín, who could occasionally lift and carry twenty pounds and ten pounds frequently, could sit for a total of six hours in an eight-work workday, could

stand and walk for a total of six hours in an eight-work workday, cold occasionally climb stairs/ramps/ladders/ropes/scaffolds, could occasionally balance/crouch/kneel/crawl, perform simple repetitive tasks, and occasionally have contact and interact with coworkers and supervisors, could work. The VE testified that such a person could not perform past relevant work but could work as a mail clerk, sorter, or marker (SVP of two, unskilled, light work). The ALJ also asked if such a person could work if in addition had to go to the bathroom each hour for ten minutes, and the VE answered no because, although the DOT does not address off-task time, in her experience, education, and rehabilitation publications, such a person would be off-task too long. Counsel for Algarín asked if a person who could not perform simple repetitive tasks and that couldn't interact with coworkers and supervisors, and the general public, could work, to which the VE answered no. Tr. 246-248.

On August 16, 2016, the ALJ found that Algarín was not disabled under sections 216(i) and 223(d) of the Act. Tr. 284. The ALJ sequentially found that Algarín:

(1) had not engaged in substantial gainful activity since her alleged onset date of January 14, 2013 through her date last insured (Tr. 286);

(2) had severe impairments: gastroparesis, osteopenia, lumbar spondylosis, depression, and a mood disorder secondary to gastroparesis (Tr. 286);

(3) did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526) (Tr. 287);

(4) could not perform past relevant work but retained the RFC to perform light work with the following limitations: lift and carry twenty pounds occasionally and ten pounds frequently; occasionally climb ramps and stairs, and occasionally climb ladders, ropes, and scaffolds; and occasionally balance, kneel, stoop, and crawl. She was also limited to performing simple and routine tasks, and occasionally interact with supervisors and co-workers, and the general public (Tr. 289, 294); and

(5) as per her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Algarín could perform (such as mail clerk, sorter, and marker). Tr. 294-295.

The ALJ further found at Step Two that Algarín had a history of hysterectomy, vaginal bleeding, and endometrial polyps, and that this condition was non-severe and did not have more

than a minimal impact on her ability to do work-related activities because it was controlled with the prescription of a Nuva Ring which controlled the bleeding, followed by no new complaints or further documentation of treatment for such condition. Tr. 287.

At Step Three, the ALJ considered Listings 1.04, 5.06, 12.04, and 12.06. Algarín's degenerative disc disease did not meet Listing 1.04 because the record did not show compromise of a nerve root or the spinal cord with the additional findings listed at Tr. 287. Algarín's record did not have a properly documented inflammatory bowel disease with the findings listed at Tr. 287, and therefore did not meet Listing 5.06.

Her mental impairments did not meet or medically equal the criteria in Listings 12.04 and 12.06. The ALJ consider the "paragraph B" criteria, and the evidence of Exhibits 4E and 5F, and found that Algarín had moderate difficulties in daily living because she reported that she could bathe and dress herself if she was not in too much pain, and reported to the consultative psychiatrist that she was able to take care of her own personal needs, and played with her daughter and helped her with school work. She also reported not cooking, driving, or shopping; and staying home most of the day due to dizziness, nausea and vomiting. The ALJ further found that Algarín had moderate difficulties in social functioning because she stayed at home in her room most of the time and did not interact with others; although she reported getting along well with her daughter, mother, and neighbors. Algarín had moderate difficulties in maintaining concentration, persistence, or pace because she reported having difficulty with attention and concentration and felt a loss of interest in activities. She reported being able to pay attention for 3-5 minutes at a time, and could not follow written or spoken instructions. However, there was evidence that her attention and concentration were normal, and her recent and remote memory were good. Algarín had no episodes of decompensation, each of extended duration. Because Algarín's impairments did not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation, each of extended duration, the paragraph B criteria were not satisfied. Tr. 287-288. The ALJ also found that "paragraph C" criteria were not satisfied for Listing 12.04. Tr. 288.

Additionally for the RFC finding, the ALJ noted that although Algarín exhibited moderate symptoms of depression, treatment records indicated that she was well-oriented, well-groomed, and had a clear thought process. Tr.289. Also, that while Algarín's medically determinable impairments could reasonably be expected to cause the alleged symptoms, her statements

concerning intensity, persistence and limiting effects were not entirely consistent with the medical evidence and other evidence. Tr. 290.

The ALJ gave great weight to Dr. Hermida's opinion (consultative internal medical examination) because he examined Algarín and his findings were consistent with the medical record and Algarín's statements. Tr. 291. As to Dr. Toro's opinion (consultative psychiatric evaluation), the ALJ noted that the DSM-IV of the American Psychiatric Association states that a GAF score between 61 and 70 indicates mild symptoms but that GAF scores may be considered a form of opinion, to which he generally gave less weight than compared to other record evidence because "a GAF rating may indicate problems that do not necessarily relate to the ability to hold a job." The ALJ gave partial weight to the GAF score, since it was partially consistent with the overall opinion of treating psychologist Dr. Rivera, who opined that Algarín was moderately limited in her ability to carry out simple tasks and had no limitations for work-like procedures. Tr. 291-292. The ALJ gave great weight to the opinions of Dr. Román and Dr. Jiménez because they were supported by the medical evidence and comported with Dr. Rivera's opinion. Tr. 292.

Algarín requested review of the ALJ's decision, and on September 6, 2018, the Appeals Council denied Algarín's request for review, rendering the ALJ's decision the final decision of the Commissioner. Tr. 1, 665. The present complaint followed. Docket No. 1.

## DISCUSSION

This court must determine whether there is substantial evidence to support the ALJ's determination at step five in the sequential evaluation process that based on Algarín's age, education, work experience, and RFC, there was work in the national economy that she could perform, thus rendering her not disabled within the meaning of the Act. The ALJ determined that through the date last insured, Algarín retained the RFC to perform light work, with simple and routine tasks, and occasional interaction with supervisors, co-workers, and the general public.

Algarín argues that the ALJ (1) erred at Step Three in finding that her mental impairment did not meet the criteria of Listing 12.04 for a depressive disorder, and should have instead found that she was disabled since her onset date; (2) erred in not finding that Algarín's RFC was for less than sedentary work activities; and (3) did not use the proper legal standard for evaluating her subjective complaints, with no full discussion of the *Avery* factors. .

Algarín asserts that her medical evidence shows that she suffered from a depressive disorder under Listing 12.04, paragraphs A and B criteria. Dkt. 13 at 9. The ALJ found that

Algarín's mental condition was not sufficiently severe to satisfy the criteria of Listings 12.04 (depressive, bipolar, and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders). Listings 12.04 and 12.06 each have three paragraphs, designated A, B, and C. A claimant's mental disorder must satisfy the requirements of both paragraphs A and B, or both A and C. *See* 20 C.F.R., Pt. 404, Subpt. P, App. 1, 12.00 Mental Disorders.

Listing 12.04 paragraph A for a depressive disorder requires medical documentation of at least five of the listed characteristics, which Algarín claims were clearly shown in the medical evidence: depressed mood, diminished interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, decreased energy, feelings of worthlessness, and difficulty concentrating or thinking. The ALJ specifically discusses "paragraph B" and "paragraph C" criteria in the Step Three section, but I note that the ALJ does not specifically discuss the paragraph A listed symptoms at Step Three, and more so makes reference to some of them when discussing paragraph B or collectively in the RFC discussion.

To satisfy the paragraph B criteria, a claimant's disorder must result in an extreme limitation of one area, or marked restrictions in two of the following areas: activities of daily living; maintaining social functioning; maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.[7]  Tr. 288.

The Commissioner pointed out that Algarín cited the revised listings, which entered into effect after the ALJ's decision in this case, and argued the wrong applicable criteria. The Commissioner further argued that the ALJ properly found only moderate limitations at Step Three.

---

[7] In the five-point rating scale contained in 20 C.F.R., Pt. 404, Subpt. P, App. 1, 12.00 Mental Disorders, the effects of a mental disorder are evaluated on each of the four areas of mental functioning based on a five-point rating scale consisting of none, mild, moderate, marked, and extreme limitation. "To satisfy the paragraph B criteria, your mental disorder must result in extreme limitation of one, or marked limitation of two, paragraph B areas of mental functioning. The five rating points are:

a. No limitation – A claimant is able to function in this area independently, appropriately, effectively, and on a sustained basis.

b. Mild limitation – A claimant's functioning independently, appropriately, effectively, and on a sustained basis is slightly limited.

c. Moderate limitation – Functioning in this area independently, appropriately, effectively, and on a sustained basis is fair.

d. Marked limitation – Functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited.

e. Extreme limitation – A claimant is not able to function in this area independently, appropriately, effectively, and on a sustained basis.

In a very short analysis of Algarín's restrictions, the ALJ found that Algarín did not meet the requirements of paragraph B. She had moderate restrictions in her activities of daily living because she reported in a function report and to the consultative psychiatrist being able to bathe and dress herself if she was not in too much pain, taking care of her own personal needs, and playing with her daughter and helping her with school work. Algarín had moderate difficulties in social functioning because while she stayed at home most of the time and did not interact with others, she got along well with her daughter, mother, and neighbors. Algarín also had moderate restrictions in concentration, persistence, or pace because there was evidence that Algarín's attention and concentration were normal, and her recent memory was good, although Algarín had reported difficulty with attention and concentration, a loss of interest in many activities, only being able to pay attention for three to five minutes at a time, and not being able to follow written or spoken instructions. Algarín experienced no episodes of decompensation, each of extended duration. Tr. 288. I credit the ALJ's acknowledgements of some of Algarín's limitations at this stage. Moderate functioning means that a claimant can fairly carry out the activity independently, appropriately, effectively, and on a sustained basis, unlike a marked limitation which means that the claimant is seriously limited in functioning in that area.

To be sure, there is plenty of evidence in the record, spanning years, that Algarín's mental condition is secondary to her gastroparesis condition, which is painful, debilitating, and constant. There is also evidence in the record that she could not have her moderate depression treated with anything other than psychotherapy because she could not tolerate medications. It is also evident from the record that she cannot control when the pain kicks in, or how her body reacts to it, or to food and nutritional supplement intake. In the ALJ's analysis of Listing 12.04, he also noted that Algarín "could bathe and dress herself IF she did not have too much pain" (our emphasis), and that Algarín reported staying home most of the day due to dizziness, nausea, and vomiting, but being able to take care of her own needs and helping her daughter with school work. All of these limitations appear to result from the physical symptoms related to her physical impairments. It also appears to be that she does what she can, when she can.

In reviewing for substantial evidence, I find that her treating psychologist's RFC assessments, and those of the non-examining consultants, are clear evidence that Algarín does not meet the Step Three standard. Excluding Dr. Rivera's assessments regarding ability to work, Dr. Rivera reported to the DDP in 2014 and 2015 that Algarín had moderate limitations in her ability

to sustain a routine without special supervision and to  understand, remember, and carry out short and simple instructions and remember short and simple instructions. She was moderately limited in her ability to interact with the general public and get along with co-workers and peers. Dr. Rivera did assess that Algarín had marked restrictions in her ability to maintain attention and concentration for extended periods and to perform at a consistent pace. There is no mention of repeated episodes of decompensation, each of extended duration. Dr. Román, consultative non-examining physician, assessed that Algarín had moderate limitations in all areas, as did Dr. Jiménez on reconsideration. None of the doctors assessed Algarín as having marked restrictions in any two areas. Accordingly, even without a paragraph A discussion, there was substantial evidence in the record to support the ALJ's finding at Step Three that Algarín's mental impairment does not qualify as a disability as it does not meet Listing 12.04B.

Algarín next contends that the ALJ erred when he determined that Algarín had an RFC for light work activities, and that the evidence shows that she has an RFC to perform less than sedentary work. Algarín does not claim that the ALJ erred in his mental RFC assessment, only as to the physical limitations. Dkt. 13 at 12-14. The ALJ assessed that Algarín could perform light work limited to lifting and carrying twenty pounds occasionally and ten pounds frequently; occasionally climb ramps and stairs, and occasionally climb ladders, ropes, and scaffolds; and occasionally balance, kneel, stoop, and crawl. Light work includes sedentary work, or work that requires lifting no more than ten pounds at a time, sitting for at least six hours out of an eight-hour work day, occasional walking and standing for no more than about two hours a day, and good use of the hands and fingers for repetitive hand-finger actions. 20 C.F.R. § 404.1567(a) & (b); SSR 83-10. Sedentary work does not require that a person be seated for six unbroken hours without shifting position during an 8-hour workday. *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004).

The ALJ is required to express a claimant's impairments in terms of work-related functions or mental activities, and a VE's testimony is relevant to the inquiry insofar as the hypothetical questions posed by the ALJ to the VE accurately reflect the claimant's functional work capacity. *Arocho v. Sec'y of Health and Human Services*, 670 F.2d 374, 375 (1st Cir. 1982).  In other words, a VE's testimony must be predicated on a supportable RFC assessment. *See* 20 C.F.R. § 404.1520(g)(1). An RFC assessment is "ultimately an administrative determination reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (*citing* 20 C.F.R. §§ 416.927(e)(2), 416.946). But because "a claimant's RFC is a medical question, an ALJ's

assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Id.* Also, when determining which work-related limitations to include in the hypothetical question, the ALJ must: (1) weigh the credibility of a claimant's subjective complaints, and (2) determine what weight to assign the medical opinions and assessment of record. *See* 20 C.F.R. §§ 404.1527, 404.1529. A claimant is responsible for providing the evidence of an impairment and its severity; the ALJ is responsible for resolving any evidentiary conflicts and determining the claimant's RFC. 20 C.F.R. § 404.1545(a)(3); *see also Tremblay v. Sec'y of Health & Human Servs.*, 676 F.2d 11, 12 (1st Cir. 1982) (citing *Richardson v. Perales*, 402 U.S. 389 (1971)).

There is ample evidence starting 2012 that Algarín suffered a series of physically debilitating conditions, the most severe being gastroparesis, which caused a lot of pain in the abdominal and pelvic area. Handling pain is questionable in this case, as evidenced in the record that Algarín could not tolerate the intake of medications. Also, delayed gastric emptying caused that she would irregularly go to the bathroom throughout the day, and along with the dizziness and vomiting, I would think that it would be difficult to program regular work breaks. The ALJ appears to have considered her pain allegations, but found that because Algarín was able to care for her personal needs and assist her daughter with homework, her statements concerning intensity, persistence, and limiting effects were not entirely consistent with the medical evidence and other evidence in the record. Tr. 290.

Algarín claimed not being able to walk long distances, or carry or lift heavy objects. She stated being able to walk nine to ten minutes leisurely before needing to stop and rest for around the same amount of time. Stress aggravated her stomach condition. Contradicting any physical limitations is Dr. Hermida's assessment, along with x-ray evidence, that Algarín's head and neck, back, extremities and joints, neurological function, and gait were normal, and assessed that "[h]er main disability appears to be related to her emotional/mental condition that could preclude an adequate social interaction. There is no impairment for walking, standing, sitting, lifting, carrying, handling objects, speaking, and hearing." I have no assessments or progress notes from the treating sources that indicate functionality to compare. Unfortunately, most of these notes were illegible.

Fortunately, though, an ALJ must take into account a claimant's subjective complaints of pain. Algarín's states regarding severe abdominal and pelvic pain, persistent fatigue and dizziness, constant vomiting, and inadequate nutrition is what makes this case a close call. She very well

summarized the extensive physical evidence contained in the record in her reconsideration request, which justify her complaints of pain, when stating that "I have problems going to the bathroom. The Gastroparesis, because it's a paralysis of the stomach, increases gastric emptying too much. Due to this condition my stomach can't contract normally and because of that it's not capable of expelling foods to the small intestine in the right form. Aggravating the situation with the adhesions of the endometriosis. Due to this condition I have vomiting, dizziness, nausea, weight loss, always feeling full, abdominal pains and abdominal weight. To maintain my weight I take nutritional supplements and vitamin injections." Tr. 341.

Algarín's testimony at the hearing is also very telling. She was prescribed a medication to be able to have bowel movement, MiraLAX twice a day or Colyte (a gallon every three days), which would swell her stomach and cause her to go to the bathroom ten or more times between 9:00 a.m. and 5:00 p.m. She would feel strong pain and contractions and it did not help her go to the bathroom regularly but, without medications, she could not evacuate. She would sometimes get injected at the hospital with morphine to reduce the pain. The ALJ also considered the bowel movement situation when he asked the VE if a person, in addition to the hypothetical based on the light work RFC, could work if in addition had to go to the bathroom each hour for ten minutes, to which the VE answered no because, although the DOT does not address off-task time, in her experience, education, and rehabilitation publications, such a person would be off-task too long. It is the claimant's burden to prove the existence of a physical or mental impairment by providing medical evidence consisting of signs, symptoms, and laboratory findings because the claimant's own statement of symptoms alone will not suffice (20 C.F.R. §§ 416.929), and there is no evidence in record of the frequency and time that Algarín needs to go to the bathroom, but evidently it comes with the territory as per the evidence contained in the record. In come the *Avery* factors.

Algarín argues that the ALJ discounted her subjective complaints, invoking *Avery v. Secretary of Health and Human Services* to support her contention. 797 F.2d 19 (1st Cir. 1986). *Avery* explains that an ALJ's assessment of disability is a two-step process. The Act first requires that "there must be a clinically determinable medical impairment that can reasonably be expected to produce the pain alleged." *Avery*, 797 F.2d at 21. Then, the ALJ must consider other evidence, including a claimant or doctor's statements "consistent with the medical findings." *Id.* Statements of subjective pain that are inconsistent with objective findings do not need to be given weight, but consistent, credible statements may "permit a finding of disability where the medical findings

Algarín-Santos v. Commissioner of Social Security, Civil No. 18-1823 (BJM)                    22

alone would not." *Id.* The *Avery* factors are: "(1) the nature, location, onset, duration, frequency, radiation, and intensity of pain; (2) precipitating and aggravating factors such as movement, activity, and environmental conditions; (3) type, dosage, effectiveness, and adverse side effects of pain medications; (4) treatment for relief of pain; (5) functional restrictions; and (6) daily activities. *See Id.* at 29.

The ALJ, in undergoing the two-step process, found that Algarín's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but her statements concerning intensity, persistence, and limiting effects were not entirely consistent with the medical evidence and other evidence in the record. Tr. 289-290. I consider that the one sentence at Tr. 289 in the RFC finding section in which the ALJ mentions physical pain and other symptoms is lacking discussion of Algarín's statements regarding pain in light of the entire, very extensive record, based on the requirements of 20 CFR 404.1529 and SSR 96-4p.

Ultimately, it is the Commissioner's responsibility to determine issues of credibility, draw inferences from the record evidence, and resolve conflicts in the evidence (*see Ortiz*, 955 F.2d at 769 (citing *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981); *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 141 (1st Cir. 1987)). I am remanding this case for further consideration and elaboration as to the effects of the claimant's pain allegations on her ability to perform work in a sustained basis and in determining the RFC. Upon remand, the ALJ is free to consider any additional evidence deemed necessary to aid in determining whether Algarín is disabled. This ruling should not be considered by the parties as an opinion on the ultimate merits of plaintiff's disability claim upon remand.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **VACATED** and **REMANDED** for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 26th day of September, 2020.

*s/ Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge